UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

JIAN LONG LI,

                     Plaintiff,

                                        **MEMORANDUM & ORDER**

       -against-                               11-CV-5636 (PKC)

LI QIN ZHAO d/b/a CHINA HOUSE
a/k/a NEW CHINA HOUSE TAKE OUT,[1]
& KING CHONG YUEN,

                     Defendants.

----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

       The dispositive issue in this wage-and-hour case is whether Plaintiff, a delivery person for a local family-owned Chinese restaurant, was an employee covered by the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 *et seq.* For the reasons set forth below, the Court finds that Plaintiff was *not* a covered employee, and thus grants summary judgment in favor of Defendants on Plaintiff's FLSA claim and, correspondingly, declines to exercise supplemental jurisdiction over his state-law claims.

\* \* \*

---

[1] Defendant Li Qin Zhao's ("Zhao") name appears incorrectly on the docket as "Qin Zhao Li." The Clerk of the Court is directed to amend the caption accordingly.

I. Background[2]

New China House Take Out ("China House"), which began doing business in August 2007, was a small dine-in, take-out, and delivery[3] restaurant in Westbury, New York, run by Zhao and her husband, Defendant King Chong Yuen ("Yuen"). (Defs.' 56.1 ¶¶ 1-4.) This 900-square foot operation consisted of four tables and a five-burner cooking range. (*Id.* ¶ 2.)

It is difficult to obtain an exact accounting of China House's finances, due to a lack of financial documentation.[4] In its tax returns to the Internal Revenue Service ("IRS"), for 2010, the restaurant reported (i) $70,901 in gross sales; and (ii) costs of $30,000 for rent, $19,246 for goods sold, $9,129 for utilities, $2,340 for other expenses (*i.e.*, telephone, trash removal, and water), $400 for legal services, and $330 for taxes and licenses. (Dkt. Nos. 46-1–46-7 ("Defs.' Exs."), Ex. B, at ECF 20-21.)[5] For the first quarter of 2011—from January 1, 2011 to April 1, 2011—the restaurant reported (i) $18,294 in gross sales; and (ii) costs of $10,400 for rent, $4,750 for goods sold, $2,499 for utilities, $784 for other expenses, $100 for legal services, and nothing for taxes and licenses. (*Id.* at ECF 4-5.)

---

[2] The Court construes any disputed facts in the light most favorable to Plaintiff, as the non-moving party, for purposes of Defendants' summary judgment motion. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970) (Harlan, J.). However, where Plaintiff either (i) admits or (ii) denies without citing to admissible evidence certain of the facts alleged in Defendants' Local Rule 56.1 Statement (Dkt. No. 46 ("Defs.' 56.1")), the Court may deem any such facts undisputed. *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)-(d). Standalone citations to "Defs.' 56.1" denote that the Court has deemed certain of Defendants' facts undisputed.

[3] China House delivered to "customers near the restaurant *within New York State*." (Defs.' 56.1 ¶ 7 (emphasis added).)

[4] China House is largely a cash-based business. According to Zhao, China House did approximately 90% of its sales in cash. (Dkt. Nos. 49-1–49-2 ("Pl.'s Exs."), Ex. 1, at 16:17-16:25.)

[5] Citations to "ECF" reference the pagination of the Court's Electronic Court Filing system, and not the particular document's internal pagination.

Other available information, however, reflects *higher-than-reported* amounts for gross sales, rent, and goods sold:

- The bank account for China House accrued a total of $60,849.97 in 2010 and $30,283.91 in the first five months of 2011. (Defs.' 56.1 ¶ 26.) The amounts of money that accrued in the restaurant's bank account, however, "might not be able to show the accurate amount of [its] income because *sometimes the cash income received by the restaurant might be used to pay something without being deposited into the bank account first*."[6] (*Id.* ¶ 22 (emphasis added).) As discussed *infra* at Section II.B.1, these amounts suggest that the restaurant earned more than its reported gross sales.

- Based on Zhao's deposition testimony, the annual rent for China House was $31,200, which appears to be more than its reported rent in 2010. (Pl.'s Ex. 1, at 17:2-17:4).

- Invoices from Chun World Vegetable Inc.,[7] China House's sole supplier (Defs.' 56.1 ¶ 15),[8] indicate that, between June 2010 and February 2011, the restaurant bought goods averaging $54,148.32 every year. (*id.* ¶ 16; Defs.' Ex. C.) These amounts seem to exceed the restaurant's reported cost of goods sold.

With respect to the employees of China House, Yuen and Zhao, as husband and wife, handled all aspects of the restaurant, including food preparation, cooking, service, and delivery. (Defs.' 56.1 ¶ 4.) The restaurant also employed Li, as a delivery person, and an unnamed individual, as a chef.[9] (Dkt. No. 48 ("Li Aff.") ¶ 8; Pl.'s 56.1 ¶ 3.) Li alleges that, during his employment, he worked approximately 11-hour shifts, six days a week, earning a monthly wage

---

[6] At the same time, these amounts are also *overinclusive*, in that they reflected "transactions which do not generate gross income to the restaurant," along with transactions which do. (Defs.' 56.1 ¶ 23.)

[7] Plaintiff Jian Long Li's ("Li") disputes the authenticity of these invoices, which date back to June 2010, on the basis that they are from "Chun World Vegetable Inc.," which did not formally register as a corporation until January 2011. (Dkt. No. 49 ("Pl.'s 56.1") ¶ 16; Pl.'s Ex. 2.) The fact that Chun World Vegetable Inc. only registered formally as a corporation, *after* certain of these invoices were sent, does not mean that the company had not been using that name *before* its registration.

[8] When needed, on a day-to-day basis, China House would also buy, from nearby supermarkets, any goods on which it was running short. (Defs.' 56.1 ¶ 15.)

[9] Yuen's father and, on occasion, his brother helped out informally. (Defs.' 56.1 ¶¶ 5-6.)

of $1,800.[10] (Li Aff. ¶¶ 9, 15.) Li speculates that "China House also paid its other employees a regular wage." (*Id.* ¶ 10.) However, there is no evidence that Yuen and Zhao paid themselves wages, apart from the restaurant's profits, if any.[11] On the contrary, Zhao testified, at her deposition, that "if . . . after expenses [my husband and I] have more [from the restaurant], then that more . . . is my wage, but if we have a loss, I even take my money to compensate it," and that the same was true of her husband. (Pl.'s Ex. 1, at 17:6-9, 17:20-21.)

Li's employment lasted from June 4, 2010 to January 28, 2011. (Defs.' 56.1 ¶ 7.) During the course of his employment, Li purportedly helped with cleaning and food preparation, in addition to making deliveries. (Li Aff. ¶ 14.) Li delivered food in his own car, averaging $15 every day in gas, which he routinely bought at "gas stations closest to China House, including Mobil, Hess and BP." (*Id.* ¶¶ 18-20.) Li also used a cellular phone to call customers about their delivery orders. (*Id.* ¶ 21.)

On November 17, 2011, Li filed suit. (Dkt. No. 1.) In Li's second amended, and operative, complaint, he claims that Defendants violated the FLSA by failing to pay him overtime, *see* 29 U.S.C. § 207 ("FLSA claim"). (Dkt. No. 30 ¶¶ 18-23.) Li also claims that Defendants violated the New York State Minimum Wage Act, N.Y. Lab. Law § 650 *et seq.*, and other regulations, *see* N.Y. Comp. Codes R. & Regs. tit. 12, §§ 146-1.4, 1.6, by failing to pay

---

[10] Meanwhile, Defendants allege that Li worked approximately four-hour shifts, six days a week, for $8 an hour, which only amounts to a monthly wage of $832. (Defs.' 56.1 ¶¶ 7, 9-10.)

[11] Yuen reportedly earned wages of $9,900 in 2010 and $10,800 in 2011, by working at another restaurant, Kings House Inc., in Freeport, New York, which he and another individual co-owned. (Defs.' Ex. B, at ECF 13, 33; Pl's Ex. 1, at 48:2-49:22.)

him overtime and spread-of-hours compensation (the "state-law claims").[12] (Dkt. No. 30 ¶¶ 18-28.)

On January 6, 2014, the parties fully briefed, and filed, Defendants' summary judgment motion, which the Court now addresses. (Dkt. No. 43.)

II. Discussion

  *A. Legal Standard*

To dismiss one of the plaintiff's claims on summary judgment, the defendants, as the moving parties, must demonstrate that "there is no genuine dispute as to any material fact," and, thus, that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because the plaintiff, as the non-moving party, has the "burden of proof at trial" on his claim, the defendants' ability to satisfy this standard as to any "essential element" of that claim "necessarily renders all other facts immaterial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (Rehnquist, J.), and entitles the defendants to summary judgment.

This standard imposes the initial burden on the defendants to show the absence of a "genuine" dispute over facts relevant to the plaintiff's claim, or any element thereof, which would allow a "reasonable jury" to "return a verdict for" the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (White, J.). "Where, as here, [the plaintiff] bears the burden of proof at trial, [the defendants] may show prima facie entitlement to summary judgment in *one of two ways*: (1) [the defendants] may point to evidence that negates [the plaintiff's]

---

[12] Another of Li's state-law claims is that Defendants violated N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.7, by failing to pay for the maintenance of his car. (Dkt. No. 30 ¶¶ 29-31.) That regulation, however, addresses the maintenance of uniforms and not cars. *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 146-1.7 ("Uniform maintenance pay"). Nonetheless, it is not necessary to clarify the basis for this claim, which the Court ultimately declines to consider upon its dismissal of Li's FLSA claim. *See infra* Section II.C.

5

claim[] *or* (2) [the defendants] may identify those portions of [the plaintiff's] evidence that demonstrate the absence of a genuine issue of material fact[.]" *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006) (emphasis added); *see also Celotex*, 477 U.S. at 323, 325 (holding that there is "no express or implied requirement" that the defendants "negat[e] [the plaintiff's] claim" with evidence of their own, as long as they "point[] out to the district court . . . that there is an absence of evidence to support [the plaintiff's] case") (emphasis omitted).

If the defendants meet their burden, the plaintiff must "go beyond the pleadings and . . . designate 'specific facts showing that there *is* a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added). To this end, the plaintiff may not merely argue that "the jury might, and legally could, disbelieve the defendant[]," *without* offering "concrete evidence from which a reasonable juror could return a verdict in [the plaintiff's] favor."[13] *Anderson*, 477 U.S. at 256; *see also Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (Stevens, J.) (same). "[W]here, notwithstanding issues of credibility [with respect to the defendants' evidence in support of summary judgment], [the plaintiff] has presented no evidence or inferences that would allow a reasonable mind to rule in [his] favor[,] . . . it may be said that the record as a whole points in one direction and the dispute is not genuine." *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998) (quotations omitted).

B. FLSA Claim

Defendants claim that there is no genuine factual dispute with respect to whether Li was a covered employee for purposes of his FLSA claim. (Dkt. No. 44 ("Defs.' Br."), at 7-9.) Upon reviewing all of the available evidence, the Court agrees.

---

[13] "This is true *even where the evidence is likely to be within the possession of the defendant[s]*, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257 (emphasis added).

Employee coverage is an element of the plaintiff's FLSA claim. *See Owusu v. Corona Tire Shop, Inc.*, No. 09-CV-3744, 2013 WL 1680861, at *3 (E.D.N.Y. Apr. 17, 2013) ("[T]he employee bears the burden of establishing his individual coverage [under the FLSA]."); *Benitez v. F&V Car Wash, Inc.*, No. 11-CV-1857, 2012 WL 1414879, at *1 (E.D.N.Y. Apr. 24, 2012) (concluding that employee coverage—in that case, based on the defendant employer's status as an "enterprise under the FLSA"—is an "element that a plaintiff must establish in order to prove liability") (collecting cases);[14] *cf. Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006) (Ginsburg, J.) (considering the "15-employee threshold" for Title VII claims) ("[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."). The plaintiff is covered by the FLSA, and thus entitled to minimum wage and overtime for his efforts, where he is (i) "engaged in commerce or in the production of goods for commerce" ("individual coverage"), or (ii) "employed in an enterprise engaged in commerce or in the production of goods for commerce" ("enterprise coverage"). 29 U.S.C. §§ 206(a), 207(a)(1); *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 n.8 (1985) (White, J.); *see also Jacobs v. N.Y. Foundling Hosp.*, 577 F.3d 93, 96-97 (2d Cir. 2009) (per curiam) (same). Therefore, the failure of the plaintiff to demonstrate an issue for trial involving employee coverage, based on either the enterprise or individual theory, is

---

[14] *See also Brown v. Peaches & Pears Soc. Club, Inc.*, No. 11-CV-224, 2011 WL 6153630, at *2-3 (E.D. Ark. Dec. 12, 2011) ("[T]he issues raised by Defendant [relating to employee coverage] involve the merits of Plaintiffs' [FLSA] claim[.]"); *Morrow v. J W Elec., Inc.*, No. 11-CV-1988, 2011 WL 5599051, at *3 (N.D. Tex. Nov. 16, 2011) (granting a *12(b)(6)* motion, given that the plaintiff "failed to allege facts that, if taken as true, establish coverage under the FLSA"); *Rodriguez v. Diego's Rest., Inc.*, 619 F. Supp. 2d 1345, 1350 (S.D. Fla. 2009) (holding that employee coverage is an "element of a plaintiff's [FLSA] claim for relief, not a jurisdictional threshold"); *McWilliams v. Dialog EMS, Inc.*, No. 06-CV-2001, 2007 WL 1725320, at *3 (N.D. Ohio June 13, 2007) (holding that the "existence of coverage under the FLSA" is an "element upon which [the plaintiffs] bear the ultimate burden at trial," with respect to their FLSA claims).

a proper basis for dismissing his FLSA claim on summary judgment. *Celotex*, 477 U.S. at 322-23.

      1. Enterprise Coverage

To prove that he is the employee of an "enterprise engaged in commerce or in the production of goods for commerce," the plaintiff must establish that his employer is an "enterprise"[15] (i) which "has employees engaged in commerce or in the production of goods for commerce, or . . . employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person"; *and* (ii) "whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)." 29 U.S.C. § 203(s)(1)(A);[16] *see also Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 528 (S.D.N.Y. 1998) (Sotomayor, J.) (explaining the "requirement that the enterprise be 'engaged in commerce or in the production of goods for commerce'"). Upon satisfying the second prong by showing that the enterprise does the "requisite dollar volume of business," *i.e.*, $500,000 every year, the plaintiff is "virtually" guaranteed to satisfy the first prong, which, unlike the requirement for individual coverage, does not demand that he "himself . . . be involved in an activity which affects interstate commerce." *Archie*, 997 F. Supp. at 528, 530 (quotations omitted).

In this particular case, Defendants "point to evidence that negates" the existence of the "requisite dollar volume of business," namely, the tax returns and bank account statements for China House. *Salahuddin*, 467 F.3d at 272-73; *Archie*, 997 F. Supp. at 530 (quotations omitted);

---

[15] The parties do not dispute that China House is an "enterprise," as defined pursuant to 29 U.S.C. § 203(r)(1).

[16] The other forms of "enterprise engaged in commerce or in the production of goods for commerce," as applied to hospitals and other healthcare facilities, schools, and public agencies, do not apply here. 29 U.S.C. § 203(s)(1)(B)-(C).

(Defs.' Br., at 8-9). The restaurant's tax returns report $70,901 in gross sales for 2010 and $18,294 in gross sales for the first quarter of 2011 (or, approximately $73,176 for that year). *See supra* Section I. These amounts fall far below the FLSA's $500,000 threshold.

Li, however, attempts to defeat summary judgment based on the amounts reported to the IRS in China House's tax returns, by attacking their credibility. (Dkt. No. 47 ("Pl.'s Br."), at 6.) According to Li, the tax returns "underreported" the gross sales for the restaurant, because its reported gross sales would not have been sufficient to cover his unfounded calculation of $181,969 in annual costs to run the restaurant.[17] (*Id.*) It is not enough for Li to argue that the tax returns did not credibly report the restaurant's gross sales, when considered alongside its costs, without furnishing "concrete" and "affirmative" evidence to support the conclusion that the restaurant's gross sales were more than $500,000 every year. *Anderson*, 477 U.S. at 256; *Crawford-El*, 523 U.S. at 600.[18] While alluding to "available evidence" in support of this conclusion (Pl.'s Br., at 5), Li has yet to identify such evidence. Li's attack on the credibility of the tax returns, therefore, does nothing to change the fact that the "record as a whole" continues to "point[] in one direction," with nothing to compel a jury to find in his favor. *Schoonejongen*, 143 F.3d at 130.

---

[17] Li's calculation is unfounded, mainly because he assumes that Yuen and Zhao were also earning monthly wages of $1,800 (Pl.'s Br., at 7), an assumption for which there is no evidentiary support. *See supra* Section I.

[18] *Compare Monterossa v. Martinez Rest. Corp.*, No. 11-CV-3689, 2012 WL 3890212, at *3 (S.D.N.Y. Sept. 7, 2012) (denying summary judgment for the defendants, based on its finding that "the Restaurant's tax returns are inconsistent with Defendants' own records" which "suggest strongly—*and perhaps even prove*—that the Restaurant had sufficient gross annual income to qualify for coverage under the FLSA") (emphasis added), *with Li v. Cheng*, No. 10-CV-4664, 2012 WL 1004852, at *5-6 (E.D.N.Y. Mar. 23, 2012) (granting the defendants' summary judgment motion, because "Plaintiffs' opposition to [this motion] attacks the accuracy of [the restaurant's tax returns] . . . but they have offered no evidence to support this assertion").

Even if China House's reported gross sales are not credible, its bank account statements also support the one-sided nature of the evidence, favoring Defendants on summary judgment. The statements indicate that the restaurant accrued, in its bank account, $60,849.97 in 2010 and would have accrued somewhere in the ballpark of $72,681.38 in 2011.[19] *See supra* Section I. These amounts do not *directly* reflect the restaurant's gross sales; in particular, they do not account for (i) "cash income received" which the restaurant first "used to pay [for] something" (Pl.'s Br., at 7 (quotations omitted); Defs.' 56.1 ¶ 22), and (ii) its 10% in non-cash sales (Pl.'s Br., at 7; Pl.'s Ex. 1, at 16:17-16:25).

Nonetheless—assuming that the amounts which accrued in China House's bank account were derived entirely from its cash sales, and that the restaurant covered all of its expenses in cash before depositing the remainder in its bank account; and factoring in the highest estimates for its costs and non-cash sales, as supported by the evidence—the resulting amounts conservatively approximate the restaurant's gross sales. At most, the costs for the restaurant were $140,747.32 in 2010[20] and would have been around $152,480.32 in 2011.[21] Adding the restaurant's costs to the amounts that it accrued, or would have accrued, in its bank account as a

---

[19] The amount of $72,681.38 was calculated based on the assumption that China House's bank account accrued, on average, $6,056.78 every month, as suggested by the $30,283.91 that it accrued in the first five months of 2011.

[20] The amount of $140,747.32 was calculated based on the following: $31,200 for rent, $54,148.32 for goods sold, $9,129 for utilities, $2,340 for other expenses, $400 for legal services, $330 for taxes and licenses, *plus* $21,600 (or $1,800 every month) in wages for each individual employee, *i.e.*, Li and the unnamed chef. *See supra* Section I. As previously discussed, Yuen and Zhao did not receive wages, but only took home what was left after all business expenses were paid.

[21] The amount of $152,480.32 was calculated based on the following: $41,600 (or $10,400 every quarter) for rent, $54,148.32 for goods sold, $9,996 (or $2,499 every quarter) for utilities, $3,136 (or $784 every quarter) for other expenses, $400 (or $100 every quarter) for legal services, *plus* $21,600 (or $1,800 every month) in wages for each individual employee, *i.e.*, Li and the unnamed chef. *See supra* Section I.

result of its cash sales, plus 10% from its non-cash sales, the Court concludes that a jury could still only find that the gross sales of the restaurant were, or would have been, far below $500,000: $223,996.99 in 2010[22] and $250,179.67 in 2011.[23] *Compare with Yang v. Shanghai Cafe Inc.*, No. 10-CV-8372, 2013 WL 3892825, at *4 (S.D.N.Y. July 29, 2013) (denying the defendant's summary judgment motion, because "cash deposits to Shanghai Cafe's Bank of East Asia account totaled *$667,592.98*," suggesting a "genuine dispute as to whether [its] annual sales satisfy the statutory threshold") (emphasis added). Meanwhile, Li makes no effort to cite other evidence to establish that "a reasonable juror could return a verdict in his favor," *i.e.*, finding that the restaurant had gross sales of more than $500,000. *Anderson*, 477 U.S. at 256.

To summarize, the "record as a whole"—namely, China House's tax returns and bank account statements—merely "points" to the conclusion that a jury would rule in Defendants' favor, and not Li's, based on the fact that the restaurant did not meet the $500,000 threshold in terms of gross sales; and Li has done nothing to alter that balance to prove a "genuine" dispute for trial. *Schoonejongen*, 143 F.3d at 130. The Court, therefore, finds no evidence of an issue for trial relating to enterprise coverage.

### 2. Individual Coverage

For purposes of individual coverage, the plaintiff is an employee (i) "engaged in the production of goods for commerce," when he "handl[es] or otherwise work[s] on goods *intended for shipment out of the State*, directly or indirectly"; or (ii) otherwise "engaged in commerce," when he "perform[s] work involving or related to the movement of persons or things (whether

---

[22] The amount of $223,996.99 was calculated by adding $60,849.97 and $140,747.32, and dividing the sum by 0.9 (or 90%).

[23] The amount of $250,179.67 was calculated by adding $72,681.38 and $152,480.32, and dividing the sum by 0.9 (or 90%).

11

tangibles or intangibles, and including information and intelligence) *among the several States* or *between any State and any place outside thereof*." 29 C.F.R. §§ 779.103, 779.104 (emphasis added). The latter requires that the plaintiff work "in the channels" of "interstate or foreign commerce," or "in activities so closely related to this commerce, as to be considered a part of it," *e.g.*, "regular[] use [of] the mails, telephone or telegraph for *interstate* communication"; "regular[] travel *across State lines* while working." 29 C.F.R. § 779.103 (emphasis added). Activities that simply "affect or indirectly relate to interstate commerce" are insufficient. *McLeod v. Threlkeld*, 319 U.S. 491, 497 (1943) (Reed, J.). As a basic rule, "if [the plaintiff] did not have any contact with out-of-state customers or businesses, he cannot be individually covered under the FLSA." *Li*, 2012 WL 1004852, at *4.

Here, Defendants "demonstrate" that Li has failed to marshal a "genuine issue of material fact" concerning his individual coverage. *Salahuddin*, 467 F.3d at 273. Li does not dispute, nor does the evidence show, that he was an employee "engaged in the production of goods for commerce." (*See* Pl.'s Br., at 8-13 (arguing that Li was "engaged in commerce," not the "production of goods for commerce") (quotations omitted); Defs.' 56.1 ¶ 7 (stating that China House only delivered to intrastate customers).)[24]

Indeed, Li's sole argument is that he was an employee "engaged in commerce," because he (i) drove an "out-of-state" car to make deliveries; (ii) bought gasoline for that car at "gas stations which operate across the United States and which obtain fuel from outside of New York State," *e.g.*, Mobil, Hess, and BP; and (iii) used a cellular phone that "function[s] by connecting to phone towers across the United States." (Pl.'s Br., at 10-12.) None of these activities,

---

[24] *See also Li*, 2012 WL 1004852, at *5 (refusing to find that the plaintiffs were "involved in the production of goods for commerce," where they "conceded" that "[s]ervers at [the restaurant] typically serve food to customers eating on the premises") (quotations omitted).

however, are sufficiently interstate in nature. The mere fact that Li drove a car, which happened to be manufactured outside of New York, to make deliveries *within* New York does not establish his engagement in an interstate activity. *See Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1316 (11th Cir. 2011) ("[The plaintiff] claimed only that [the company] had purchased or leased vehicles that had, at some point, moved in interstate commerce . . . . [T]he point of origin of these vehicles . . . is irrelevant to the issue of individual coverage[.]").[25] Nor does Li's *in-state* purchasing of gasoline from nationwide gas station chains with out-of-state suppliers. *See Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1267-68 (11th Cir. 2006) (citing *Dunlop v. Indus. Am. Corp.*, 516 F.2d 498 (5th Cir. 1975), for the proposition that "[w]hen goods [such as gasoline] reach the customer for whom they were intended, the interstate journey ends and employees engaged in any further *intra*state movement of the goods are not covered under [the FLSA]") (emphasis in original).[26] Lastly, the use of a cellular phone by Li, but *not* for communication between states, is strictly an intrastate activity, notwithstanding the fact that it utilizes interstate technology. *See Junkin v. Emerald Lawn Maint. & Landscaping, Inc.*, No. 04-CV-1537, 2005 WL 2862079, at *4 n.5 (M.D. Fla. Nov. 1, 2005) (rejecting the plaintiff's argument that "his use of a cellular phone constitutes the use of a channel of interstate

---

[25] Judge Edward R. Korman of this District sat by designation on the panel in *Josendis*, and, although he dissented to another portion of the panel's decision, he agreed that the plaintiff had not "participated in the movement of any object in interstate commerce or travelled . . . outside of Florida." 662 F.3d at 1321 (Korman, J., dissenting).

[26] *Cf. McLeod*, 319 U.S. at 494 ("[H]andlers of goods for a wholesaler who moves them interstate on order or to meet the needs of specified customers are in commerce, while those employees who handle goods after acquisition by a merchant for general local disposition are not."); *compare Boekemeier v. Fourth Universalist Soc'y in the City of N.Y.*, 86 F. Supp. 2d 280, 287 (S.D.N.Y. 2000) (finding individual coverage, based on the fact that the plaintiff "order[ed] cleaning supplies and equipment for the Church from out-of-state vendors," which led to "delivery made across state lines"), *with Locke v. St. Augustine's Episcopal Church*, 690 F. Supp. 2d 77, 90-91 (E.D.N.Y. 2010) (Azrack, Mag. J.) (declining to find individual coverage, because the plaintiff "purchas[ed] goods from local vendors").

commerce, thereby affording him individual coverage under the FLSA," where there was "no evidence to show that the phone calls he made were interstate calls"); 29 C.F.R. § 779.103 (citing use of the telephone "for interstate communication").[27]

These activities, at best, "affect or indirectly relate to interstate commerce." *McLeod*, 319 U.S. at 497. To conclude otherwise would lead to untenable results: any employee who regularly uses a car or cellular phone for work, whether or not he engages with "out-of-state customers or businesses," would be covered under the FLSA.[28] *Li*, 2012 WL 1004852, at *4. It is difficult to imagine anyone, in this modern day and age, who does not meet this definition. The Court, therefore, finds no triable issue relating to individual coverage.

Accordingly, because Defendants have shown that the absence of employee coverage is not genuinely disputed, the Court dismisses Li's FLSA claim on summary judgment.

### C. State-Law Claims

The district court "may decline to exercise supplemental jurisdiction," if, among other things, it has already "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). In the "usual case in which all federal-law claims are eliminated before trial," the

---

[27] *Cf. Thorne*, 448 F.3d at 1267 (holding that, although a credit card is possibly an "instrumentality of interstate commerce," its use for "purchases made locally" is not "interstate activity").

[28] Such a nexus to interstate commerce may be sufficient to establish the jurisdictional element for criminal prosecutions under the Hobbs Act, but not to establish individual coverage as an element of claims under the FLSA. Under the Hobbs Act, "the effect on interstate commerce need only be slight or subtle." *U.S. v. Needham*, 604 F.3d 673, 681 (2d Cir. 2010) (citing *U.S. v. Angelilli*, 660 F.2d 23 (2d Cir. 1981), and *U.S. v. Jamison*, 299 F.3d 114 (2d Cir. 2002), with approval). Indeed, the fact that a criminal defendant robs a store that sells products "purchased from in-state suppliers," but "*originated out-of-state*," is a sufficient basis for prosecuting that defendant pursuant to the Hobbs Act. *U.S. v. Elias*, 285 F.3d 183, 189 (2d Cir. 2002) (emphasis added); *see also U.S. v. Suggs*, 14 F. App'x 54, 56 (2d Cir. July 5, 2001) (finding that a criminal defendant's robbery of a store that sells "numerous products manufactured outside the state" is sufficient to establish an "effect on interstate commerce").

relevant factors of "judicial economy, convenience, fairness, and comity," which the district court should consider before declining to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c), will "point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (Marshall, J.) (citing *United Mine Workers of Am. v. Gibbs* ("*Gibbs*"), 383 U.S. 715 (1966) (Brennan, J.)); *see also Li*, 2012 WL 1004852, at *6 (declining, at the summary judgment stage, to exercise supplemental jurisdiction over the state-law claims, after dismissing FLSA claims for lack of enterprise and individual coverage).

Indeed, Li's obvious lack of employee coverage under the FLSA suggests that this case is an "effort to impose upon [the Court] what is in effect only a state law case," and that his FLSA claim is a mere "appendage" meant to turn this case into a federal one. *Gibbs*, 383 U.S. at 727. Having dismissed Li's FLSA claim, the Court declines to exercise supplemental jurisdiction over his state-law claims.

### III. Conclusion

Therefore, the Court dismisses Li's FLSA claim *with* prejudice, and dismisses his state-law claims *without* prejudice to be re-filed in state court. The parties shall bear their own costs and fees. The Clerk of the Court is directed to enter judgment accordingly, and close this case.

                                      SO ORDERED:

                                      /s/ Pamela K. Chen
                                      PAMELA K. CHEN
                                      United States District Judge

Dated: August 8, 2014
      Brooklyn, New York